# EXHIBIT 19

# Donald Mitacek's Deposition Transcript

```
                UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF MICHIGAN


 CATHERINE ROBERTS,
           Plaintiff,              CASE NO. 22-CV-12678
      vs                           HON. MARK A.
                                   GOLDSMITH
 DELTA AIR LINES, INC.,            MAGISTRATE JUDGE:
                                   DAVID R. GRAND
           Defendant.
 _____/


 PAGES 1 THROUGH 48


      VIDEOCONFERENCE DEPOSITION OF DONALD MITACEK,

 Taken by the Plaintiff before Debra M. Cummings, Court

 Reporter (CSR-6037) and Notary Public for the County of

 Livingston, acting in the County of Livingston, Michigan, on

 Tuesday, October 10, 2023 at 1371 Old Kinderhook Drive,

 Camdenton, Missouri at 4:35 p.m.
```



Fortz Legal Support
www.FortzLegal.com
844.730.4066

```
 1                    UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT OF MICHIGAN

 3

         CATHERINE ROBERTS,
                  Plaintiff,              CASE NO. 22-CV-12678
                  vs                      HON. MARK A.
                                          GOLDSMITH
         DELTA AIR LINES, INC.,           MAGISTRATE JUDGE:
                                          DAVID R. GRAND
                  Defendant.
         _____/
11

12       PAGES 1 THROUGH 48

13

14            VIDEOCONFERENCE DEPOSITION OF DONALD MITACEK,

15       Taken by the Plaintiff before Debra M. Cummings, Court

16       Reporter (CSR-6037) and Notary Public for the County of

17       Livingston, acting in the County of Livingston, Michigan, on

18       Tuesday, October 10, 2023 at 1371 Old Kinderhook Drive,

19       Camdenton, Missouri at 4:35 p.m.

20

21

22

23

24

25
```

Page 2

```
 1      APPEARANCES:
 2      (ALL PARTIES VIA VIDEOCONFERENCE)
 3      MS. NADINE DABAJA P85734
 4      Stempien Law, PLLC
 5      38701 Seven Mile Road, Suite 130
 6      Livonia, Michigan 48152
 7      (734) 744-7002
 8      Ndabaja@gmail.com
 9         Appearing on behalf of the Plaintiff.
10
11      MS. S. RAE GROSS P42512
12      Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
13      34977 Woodward Avenue, Suite 300
14      Birmingham, Michigan 48009
15      (248) 593-6400
16      Rae.gross@ogletree.com
17         Appearing on behalf of the Defendant.
18
19      ALSO PRESENT:
20      VALERIA COMETTO
21
22      DEBRA M. CUMMINGS, CSR 6037
23
24
25
```

Page 4

```
 1              Camdenton, Missouri
 2              Tuesday, October 10, 2023
 3              at or about 4:35 p.m.
 4         THE REPORTER:  My name is Debbie Cummings,
 5   certified stenographic reporter and notary public in the
 6   State of Michigan.  This deposition is being held via
 7   videoconferencing equipment.  The witness and reporter are
 8   not in the same room.  The parties and their counsel consent
 9   to this arrangement and waive any objections to this manner
10   of reporting.  Please indicate your agreement by stating
11   your name and your agreement on the record and please
12   announce anyone else in the room with you.
13         MS. DABAJA:  Nadine Dabaja on behalf of plaintiff,
14   and we agree to the arrangement.  There's nobody else in the
15   room with me.
16         MS. GROSS:  Rae Gross on behalf of the defendant.
17   We also agree to the arrangement, and there is no one else
18   with me.
19         DONALD MITACEK,
20   having first been duly sworn to tell the truth, the whole
21   truth, and nothing but the truth, testified as follows:
22         MS. DABAJA:  Okay.  Let the record reflect this is
23   the deposition of Mr. Donald Mitacek taken pursuant to, and
24   the transcript of which will be used for all permissible
25   uses under both the Michigan Court Rules and the Michigan
```

Page 3

```
 1              TABLE OF CONTENTS
 2   WITNESS                                           Page
 3   DONALD MITACEK
 4       EXAMINATION BY MS. DABAJA:                      5
 5       EXAMINATION BY MS. GROSS:                      41
 6
 7   EXHIBITS                                          Page
 8       DEPOSITION EXHIBIT NUMBER 1:                    9
 9       Delta Frontline Performance Development
10       Employee Guidelines.
11       DEPOSITION EXHIBIT NUMBER 2:                   15
12       December 18, 2020 Memo from John Mazza to
13       Greg Bowker
14       DEPOSITION EXHIBIT NUMBER 3:                   18
15       Cathy Roberts Initial Statement
16       DEPOSITION EXHIBIT NUMBER 4:                   19
17       April 9, 2021 E-mail
18       DEPOSITION EXHIBIT NUMBER 5:                   31
19       TechOps: Lead Evaluation for Catherine
20       Roberts
21       DEPOSITION EXHIBIT NUMBER 6:                   42
22       April 16, 2021 Memo From Don Mitacek to
23       Catherine Roberts
24
25       (Exhibits attached to Transcript)
```

Page 5

```
 1   Rules of Evidence.
 2              EXAMINATION
 3   BY MS. DABAJA:
 4   Q.  Good afternoon, Mr. Mitacek.  My name is Nadine Dabaja.  I'm
 5       an attorney, and I'm here today on behalf of Catherine
 6       Roberts, who is the plaintiff in a lawsuit that's been
 7       brought against Delta Air Lines.
 8           Mr. Mitacek, have you participated in a deposition
 9       before?
10   A.  I have.
11   Q.  Well, we'll just go through some ground rules for today to
12       make sure that this goes smoothly for us and the court
13       reporter.  I just ask that you verbalize all of your answers,
14       make sure you're giving me yes or no answers, no nods, no
15       um-hum or uh-uhs, just so that she's able to record them.  If
16       you don't understand or hear a question, please let me know,
17       I'm happy to repeat myself.  At times you might anticipate my
18       question, so I ask that you just allow me to finish, and then
19       give me your answers so that the court reporter can record
20       both of those things.  And then, finally, if you give me an
21       answer, I'm going to assume that you understood it and heard
22       it, is that fair?
23   A.  Yes.
24   Q.  Okay.  Mr. Mitacek, are you currently employed by Delta Air
25       Lines?
```

Page 6

1  A.  I retired May 1st, 2023.
2  Q.  Okay. And prior to you retiring what position did you hold
3      at Delta Air Lines?
4  A.  I was senior vice president of Delta TechOps.
5  Q.  And what years did you hold that position at Delta?
6  A.  I think it was 2013 until the time I left -- no. I'll take
7      that back. I'm sorry -- 2015.
8  Q.  Okay. And what were your job duties as senior VP of TechOps?
9  A.  I was responsible for the safe flight of Delta's fleet of
10     aircraft.
11 Q.  And so what was your day to day like, what kind of
12     responsibilities were you handling?
13 A.  It would vary quite a bit, but generally speaking, we would
14     review the fleet in the morning and make sure that it was
15     ready to go for the daily operations; we worked on a lot of
16     operational improvement stuff day to day; we also have a
17     business with inside of TechOps that does maintenance for
18     other airlines, so I did that most every day. So that, kind
19     of generally, that's what I would do.
20 Q.  Okay. And who did you work with mostly, and not necessarily
21     by name, but maybe by position?
22 A.  Always the operations team, the finance team, the HR team,
23     the supply chain team. Those were kind of -- and the
24     engineering group -- kind of the day-to-day interactions I
25     would have.

Page 7

1  Q.  Okay. And who does the operations team consist of, what kind
2      of employees?
3  A.  So on operations side there's a vice president of line
4      maintenance, a vice president of base maintenance, a vice
5      president of engineering and component maintenance, a vice
6      president of the MRO group, and vice president of
7      engineering.
8  Q.  Okay. And then the engineering team that you said you work
9      with, is that comprised of engineers?
10 A.  Yeah. They're all engineers.
11 Q.  Okay.
12 A.  Where's the operation is technical people, the people that
13     are actually working the airplanes.
14 Q.  Got it. And so those engineers, who are members of the
15     engineering team that you work with regularly, what is their
16     formal title at Delta?
17 A.  Engineering.
18 Q.  Just engineers?
19 A.  Yeah. I mean, there's different grades of engineers, but
20     generally speaking, engineering.
21 Q.  Okay. But not to be confused with technicians, correct?
22 A.  Correct.
23 Q.  Okay. And who did you report to as part of that senior VP
24     position?
25 A.  Our chief operating officer.

Page 8

1  Q.  And who was that at the time?
2  A.  At the time it was Gil West.
3  Q.  Okay. And in what capacity did he -- so would you consider
4      him to have been your supervisor?
5  A.  Yeah. I reported to him. Yes.
6  Q.  Okay. Mr. Mitacek, are you familiar with the plaintiff in
7      this case, Ms. Catherine Roberts?
8  A.  I do not know her.
9  Q.  Okay. In what instances were you made familiar with her at
10     all, how did you know that she was an employee of Delta?
11 A.  Through the CRP process.
12 Q.  And that was following the December 2020 incident, correct?
13 A.  I don't know the date off the top of my head.
14 Q.  Okay.
15 A.  But it was through the CRP process.
16 Q.  Got it. And that was right before step 4 of the CRP process,
17     correct?
18 A.  I don't want to say about if it was the step 4. It was the
19     CRP process when I got involved and was asked to review the
20     case.
21 Q.  Got it. Okay. And we'll get to that in more detail, so you
22     can refresh your memory.
23 A.  Yeah. Thank you.
24 Q.  Of course. So what I'll do throughout the deposition, Mr.
25     Mitacek, is present exhibits by sharing my screen here on

Page 9

1      Zoom. I'll open them up on Adobe just to display a PDF, I'll
2      give you some time to review the document, and then you can
3      let me know when you'd like me to scroll down if it's longer
4      than one page, and then I will ask you some questions about
5      it after that. Okay?
6  A.  Okay.
7  Q.  So I am introducing Exhibit 1 here. This is the Delta
8      Frontline Performance Development Employee Guidelines. Can
9      you see that?
10 A.  I can.
11 Q.  Okay. Have you seen this before, Mr. Mitacek?
12 A.  I probably have during my tenure at Delta, but I can't say
13     it's something very specific I remember.
14 Q.  I'll give you some time to read over it. Let me know when
15     you'd like me to scroll.
16         DEPOSITION EXHIBIT NUMBER 1 WAS MARKED BY THE
17         REPORTER FOR IDENTIFICATION.
18         THE WITNESS: Okay. You can scroll. Okay.
19 BY MS. DABAJA:
20 Q.  Scroll some more?
21 A.  No. That's good. Okay. Stop. Thank you. Okay. You can
22     scroll, please. Okay.
23 Q.  Did that refresh your memory, do you remember if you had seen
24     this document before?
25 A.  I have earlier in my career at Delta. Yes.

Page 10

1  Q. And at any point after you viewed it for the first time or
2     when used to regularly, were you working in any capacity that
3     involved any of these corrective actions or written or verbal
4     coachings that are discussed here?
5  A. Me personally?
6  Q. Yes.
7  A. Have I written up anybody?
8  Q. Have you been involved in any capacity in anyone being
9     written up in any of these ways?
10 A. Via the CRP process.
11 Q. Okay. And is that typical or a part of protocol that you
12    would be involved at that stage?
13 A. It was part of the CPR process should it get to my level.
14 Q. Okay. Are you familiar with the corrective action process
15    that's discussed here?
16 A. Yeah. Yes.
17 Q. Would you say that -- or at the stage that you are making the
18    decisions that you're making in the CRP process, are you
19    considering things like verbal coachings, written coachings,
20    and other corrective action?
21         MS. GROSS: I'm going to object to the form of the
22    question as vague. If you understand it, answer.
23         THE WITNESS: I look at every case individually on
24    the merits and the facts of that case to make a decision.
25    So I do look at their history, their performance, do they

Page 11

1     have past performance issues. So I do try to take in all
2     the facts that I can before I make a decision.
3  BY MS. DABAJA:
4  Q. Okay. And when you're looking into the history and other
5     performance issues, does that mean that you're reviewing the
6     verbal and written coachings and corrective action notices as
7     part of that review?
8  A. Not necessarily reading the very specific details of past
9     disciplinary action, because once it's already in their file,
10    I'm assuming that HR and the operations or management team
11    has looked at it and reviewed it. Now, I will look at it to
12    understand what it was, but probably past performance, things
13    that are still in their file. I wouldn't necessarily look at
14    the very specific details.
15 Q. Okay. And when you say very specific details, do you mean
16    actually reviewing the notice that the employee received with
17    the details of the performance issue?
18 A. I would look at the infraction and what the employee was
19    written up for.
20 Q. And in what form?
21 A. And I'm talking past disciplinary action that would actually
22    be in their file.
23 Q. And what format do you review that in, how does that show up
24    for you?
25 A. In the CRP process, I typically get the CRP, what they refer

Page 12

1     to as the deck.
2  Q. Um-hum.
3  A. I typically get the employee's personnel employment file, and
4     that's the documents I receive.
5  Q. Okay. And does the employment file contain the corrective
6     action notices?
7  A. Yes. If they're still valid, because they have, you know, a
8     time limit on them. So if they're not valid, then they're
9     removed.
10 Q. Got it. Okay. So when you reach the point of the CRP
11    process, at that point, that means when you get involved, CRP
12    has already come to a decision and elevating it to step 4
13    means that you're reviewing that decision and making your
14    recommendation, correct?
15 A. That's correct.
16 Q. And so at that point, were you giving the employment file and
17    the decision to terminate, let's say, a set of fresh eyes or
18    are you working with the decisions already made beneath you?
19 A. I look at it at the facts of the case and make a decision
20    based on what I'm reading from the deck and from the
21    employee's file.
22 Q. Okay. I'll stop sharing my screen here for a moment. So Mr.
23    Mitacek, how did you become aware of Ms. Roberts' potential
24    termination from Delta Air Lines?
25 A. Through the CRP process, when the file was given to me to

Page 13

1     review and make my recommendation.
2  Q. And who was it given to you by?
3  A. My assistant.
4  Q. And who shared it with your assistant?
5  A. I don't know who from the CRP, typically, would give that to
6     her.
7  Q. But you can confirm that it's someone from CRP?
8  A. I cannot.
9  Q. Okay. And once you received Ms. Catherine Roberts' file, did
10    you have any communications with anyone else on her team or
11    anything like that before you made your decision?
12 A. The only person I communicated with, I believe in this one,
13    was Jerry Allen. He was the vice president of line
14    maintenance, and I don't really recall the specifics of what
15    we talked about, but I did have a question. But outside of
16    Jerry, I don't think I talked to HR, because sometimes I
17    will. I just don't recall if I talked to HR to get some
18    additional details.
19 Q. Okay. And what additional details do you think that you
20    would be looking for that wouldn't be included in the
21    employee file?
22 A. Well, like I said, I don't recall exactly why I talked to
23    Jerry, but if there was missing information that I thought
24    was pertinent, then I would ask. So you're kind of asking me
25    to speculate on what type of things would be missing. I just

Page 14

1  don't recall why I asked him.
2  Q. Not necessarily in Ms. Roberts' case. I'm saying, generally,
3     in your process of review, what additional information are
4     you trying to get from others that wouldn't be in an employee
5     file?
6  A. If there was a write-up that I just didn't understand, I may
7     ask for further clarification. If it was disciplinary action
8     that maybe didn't make sense to me, I would ask for further
9     information.
10 Q. And so with regards to Ms. Roberts, you may have had those
11    types of questions, you just don't remember what they were,
12    correct?
13 A. Yeah. I just vaguely remember talking to Jerry Allen, and
14    it's pretty rare that we do let somebody go from Delta, so
15    that's why this one a little bit sticks out where I recall
16    talking to him. I just don't recall about what, the
17    specifics.
18 Q. Okay. Mr. Mitacek, do you remember what the CRP's decision
19    was when the file was first presented to you in Ms. Roberts'
20    case?
21 A. I did not recall it until preparation for this, and then it
22    jogged my memory.
23 Q. Okay. And are you comfortable with speaking about it now or
24    would you like me to bring up their decision as an exhibit?
25 A. You can bring it up, please.

Page 15

1  Q. Okay. And just before we start talking about that, I'd like
2     to know, when you receive the employee file, in order to make
3     your decision in that CRP process, are you also receiving the
4     letters that were sent to the employee as a notice of
5     termination?
6  A. No, because the decision wasn't made at that point, so I
7     would have no letters to review.
8  Q. Well, doesn't the CRP process only take place if the employee
9     appeals the termination?
10 A. No. I do not know that. Oh, the whole process, yes, yes,
11    yes. I see what you're saying.
12 Q. Okay. And so would you have reviewed, for example, a letter
13    from HR letting her know that she's terminated?
14 A. I don't believe so, but I don't recall.
15 Q. Okay. Do you recall seeing a memo from HR recommending her
16    termination?
17 A. You would have to show that to me. I don't remember off the
18    top of my head.
19 Q. Okay. We can look at that first. Well, we'll start here.
20    I'm introducing what we'll mark as Exhibit 2.
21       DEPOSITION EXHIBIT NUMBER 2 WAS MARKED BY THE
22       REPORTER FOR IDENTIFICATION.
23 BY MS. DABAJA:
24 Q. This is a letter from John Mazza, the station manager at DTW
25    airport where Ms. Roberts addressed to Greg Bowker, the line

Page 16

1  maintenance director at the same airport. I'll give you a
2  second to review it. Let me know when to scroll. It's two
3  pages.
4  A. You can scroll. You can scroll. Okay.
5  Q. Do you remember if this memo here was in the file that you
6     reviewed?
7  A. I believe it was.
8  Q. Okay. And is this memo how you became familiar with that
9     last December 10th, 2020 incident?
10 A. I wouldn't say this was the specific memo. Like I said, I
11    read the deck from the CRP. Again, I wouldn't say this was
12    the specific memo that introduced me to Catherine or the
13    issue, but it was one of them for sure.
14 Q. Well, let's backtrack a little bit. What is included that
15    the CRP shares with you in making your decision?
16 A. It's, typically, the recommendation from each of the CPR
17    members.
18 Q. Um-hum.
19 A. And this memo would have been in there, other things from the
20    company and from Catherine would have been in there, and then
21    Catherine's employee file separately.
22 Q. Okay. And so was your review of Ms. Roberts' file the first
23    time that you heard of this December 10th, 2020 incident?
24 A. I believe so.
25 Q. Okay. Do you remember whether you looked into these

Page 17

1  corrective action notices listed here on the second page of
2  Mr. Mazza's memo during your review?
3  A. If those were in her file, which I assume they were, I looked
4     at the -- probably looked at the infraction just to
5     understand it, but not, you know, was it -- because it's
6     already in the file, it's already gone through HR and the
7     whole process. So again, I'm not questioning if that was
8     appropriate or not, if that makes sense.
9  Q. That does make sense. Well, let's talk about that. I'll
10    stop sharing my screen here. What is your review process
11    like, Mr. Mitacek, can you walk me through it.
12 A. Typically, I'll review each of the CRP members'
13    recommendation and notes, I'll review the company information
14    and why they feel in this case they should -- Catherine
15    should have been terminated, I'll review Catherine's
16    information, and then I'll review anything in her file that I
17    think, you know, like past discipline. And again, I'm not
18    reading the very specific details of her past discipline,
19    just trying to get overall sense of her and her employment in
20    this case.
21 Q. Okay. And so you shared that you look at the CRP's
22    recommendation and notes, and then you look at the company's
23    decision and reasons to terminate. Then you said you look at
24    Cathy's information. What are you referring to when you say
25    Cathy's information?

Page 18

1  A. Well, she had -- she replies to the CRP process as well, and
2     during the investigation of this particular airplane that is
3     in question, there was also statements from employees that
4     were involved. So I reviewed those as well.
5  Q. Okay. And would Cathy's information have included her
6     initial statement and additional clarifying statements?
7  A. I believe so, but you would have to show me to refresh my
8     memory.
9  Q. Sure. I'll do that now. I am introducing Exhibit 3 here.
10        DEPOSITION EXHIBIT NUMBER 3 WAS MARKED BY THE
11        REPORTER FOR IDENTIFICATION.
12        THE WITNESS: Sorry, I'm drinking my lunch here.
13 BY MS. DABAJA:
14 Q. That is okay.
15 A. My wife made a smoothie here.
16 Q. So this is Exhibit 3, Cathy Roberts' initial statement. Does
17    this look familiar to you, Mr. Mitacek?
18 A. If it was in the CRP deck, I'm sure I looked at it.
19 Q. Would it have been?
20 A. It should have been, but I can't say that for sure.
21 Q. Okay. Would you like to read through it, if that would help?
22 A. I'm reading it.
23 Q. Okay.
24 A. Okay. You can scroll, please. Okay. Okay.
25 Q. Does that refresh your memory at all or do you still not

Page 19

1     remember if you had reviewed this?
2  A. I'm sure if it was in the CRP deck I reviewed it, but keep in
3     mind, this is a long time ago.
4  Q. Right. Okay. That's fair. So let's continue talking about
5     your process for review. So you review all of that material,
6     and let's say in this -- well, let's say in the instance
7     where there's a recommendation for termination and the CRP
8     confirms that recommendation, does that ever go to you or
9     does it stop there?
10 A. I don't know, specifically, why some CRPs are given to me and
11    why some are not. I know my part of the process is, when I
12    get them, is to review it and make a recommendation. And so
13    I assume, by the time they get to me, they're going through
14    the right process and I'm getting the ones I'm responsible
15    for.
16 Q. Okay. I am going to introduce here Exhibit 4.
17        DEPOSITION EXHIBIT NUMBER 4 WAS MARKED BY THE
18        REPORTER FOR IDENTIFICATION.
19 BY MS. DABAJA:
20 Q. This is an e-mail from Jerry Allen who you referred to
21    earlier?
22 A. Um-hum.
23 Q. Sent to TechOps on Friday, April 9th. I'll give you a chance
24    to read this and then you can let me know when to scroll when
25    you're finished.

Page 20

1  A. Yes. I'm good. I read it.
2  Q. Okay. So you see what this is?
3  A. Yes.
4  Q. Okay. And so at this point Jerry says, "Good afternoon.
5     After careful discussion and consideration we would like to
6     formally request stage 4 process evaluation. Please let me
7     know if you have any questions or need anything else from
8     me." Is stage 4 where you get involved?
9  A. **Again, you know, I don't know the very specifics of the**
10    **process stage 4, stage 3, stage 2. I just know when the CRP**
11    **comes to me and says we have it reviewed for you, it's gone**
12    **through the process, and I'm to do my part of the process**
13    **that I'm responsible for. How it gets to me, in what stage**
14    **of the process it's in, you know, I don't know.**
15 Q. Okay.
16 A. **But I believe you're right, stage 4 is my piece of the**
17    **process.**
18 Q. Okay. And just to confirm, let's kind of go through this
19    e-mail here that we have. So this e-mail from Mr. Allen was
20    in response to a March 31st, 2021 e-mail from TechOps
21    reading, "Good afternoon. A termination CPR hearing was held
22    today for Catherine Roberts. After careful consideration of
23    the testimony" etc., etc. "The review panel provided a
24    modify decision of the termination." And then it reads that
25    the action is to, "Reinstate the employee with a demotion

Page 21

1     from lead AMT", which she was holding at the time. And then
2     it's signed by Rick Perez, someone from the CRP, right? And
3     then Jerry Allen replies that he'd like to formally request
4     stage 4 process evaluation, which we can safely conclude
5     involves you. Do you know under what circumstances a Delta
6     employee, someone like Mr. Allen, could request stage 4
7     process evaluation and your involvement?
8  A. You would need to ask Jerry. I do not know.
9  Q. Does this e-mail at all guide you in remembering what you
10    could have talked to Jerry about?
11 A. No. It does not guide me.
12 Q. Do you remember whether your conversation with Jerry was
13    before Friday, April 9th or after Friday, April 9th?
14 A. Do you know when I would have reviewed the CRP, because I
15    can't answer? I don't know the dates off the top of my head.
16    It was while I was reviewing the CRP.
17 Q. I do know that you sent a letter to Ms. Roberts, and we can
18    bring that up later on 8-14 of 2021 confirming her
19    termination.
20 A. So again, I know I talked to Jerry after I received the deck
21    from the CRP.
22 Q. Do you remember how long it took you to review her file and
23    reach a decision?
24 A. I do not.
25 Q. Could we roughly estimate, do you think that it was maybe a

Page 22

1  week or a month or less than that?
2  A.  No.  I think I only have a specific amount of time to review
3     it.
4  Q.  Okay.
5  A.  And I, typically when I get them, I carve out a couple hours
6     and review it.  And then if I, like I say, in some cases if I
7     have additional questions, I may talk to HR or in this case I
8     do recall talking to Jerry, but I usually try to review it
9     and get all the facts and conclude that decision.
10 Q.  Okay.  Now, let's get into the specifics of your confirmation
11    of Ms. Roberts' termination.  So at this point you've
12    reviewed her file, you've asked the necessary questions to
13    the people that you thought to call at the time.  How did you
14    reach your decision to terminate Ms. Roberts?
15 A.  One is her repeated track record of poor performance, and
16    two, is on that specific issue with the airplane, I felt
17    there was a significant integrity issue, and that aviation
18    industry is based on integrity and trustworthiness, and I
19    felt like that was missing in her decision.
20 Q.  Okay.  And just for purposes of the record, I misspoke.  I
21    said that your letter to Ms. Roberts was dated April 13th.
22    It was actually dated April 16th.  So that's my mistake.
23    There was a letter sent you to on April 13th that I may bring
24    up in a minute, but just wanted to clarify that.
25 A.  Okay.

Page 23

1  Q.  So let's talk about that integrity issue.  What was the
2     integrity issue that you identified in Ms. Roberts' case?
3  A.  Specifically not coming forward and saying she missed the
4     airplane.  Now, those operational meetings, if you're asked
5     or if you're not asked, you're responsible for your airplanes
6     and your people, and by not bringing it up, it's a huge
7     concern from integrity and safety of flight.
8  Q.  Did Ms. Roberts have a formal obligation to bring something
9     like that up, was that a part of policy?
10 A.  100 percent responsible to bring that up.
11 Q.  And how would she have been put on notice that she was
12    responsible to bring that up?
13 A.  Because that's the fundamentals of aviation and being a
14    leader at Delta Air Lines.  When she took that job, it was
15    her responsibility.
16 Q.  Right.  And I'm asking how would she have been put on notice
17    that it was required for her to share that during operational
18    meetings?
19 A.  Because that's the standard protocol that they go through
20    every single shift every single day.
21 Q.  I understand.  Is that standard protocol part of procedure or
22    a protocol that's written down somewhere?  Is it a part of
23    company policy?
24 A.  Integrity is built in the Delta airplanes.  It's in our rules
25    of the road.  It's the way we fly.

Page 24

1  Q.  I understand that.  Ms. Gross has shared that with us and
2     I've seen that.  I think my specific question is, in the
3     instance of Ms. Roberts' case where, you know, she overlooked
4     this aircraft on her turnover, right, and she, prior to the
5     meeting, does everything she can to address the issue, and as
6     you saw in her initial statement that I just shared with you,
7     she addressed the issues, she got to the meeting,
8     specifically answered the question that was asked to her, and
9     following the meeting did the necessary followup she had to
10    do to make sure that everything went through smoothly.
11        So in that instance, I'm wondering if there's a
12    specific requirement that she have disclosed that, unless she
13    needed help from someone else who was part of that meeting or
14    she had to ask questions?
15        MS. GROSS:  I'm going to object to the form of the
16    question.  There's like 12 questions in there.
17 BY MS. DABAJA:
18 Q.  Okay.  I'll shorten that up.  I'll shorten that up.  Unless
19    Ms. Roberts had to ask someone for help at that operations
20    meeting, under what circumstance would she have shared that
21    she overlooked that aircraft?
22 A.  During her out-briefing with the operations team, that's why
23    you get together.  Is the airplanes ready, is there any
24    concerns.  You're preparing for the day.  I did it as a
25    senior vice president of TechOps.  I reviewed every airplane

Page 25

1     that was out of service every day with my team.
2  Q.  Okay.  And you can tell me if you would have to speculate to
3     answer this question, but if she did share that during that
4     meeting what would have happened?
5         MS. GROSS:  Okay.  I'm going to object as calls
6     for speculation.
7         THE WITNESS:  Yeah.  I can't answer that.
8  BY MS. DABAJA:
9  Q.  I guess I'm just trying to get to what is the purpose of her
10    having shared that, what would be accomplished by that?  Why
11    was there significance to the fact that she never shared it?
12 A.  Again, that's part of the DNA in the aviation industry and
13    Delta Air Lines, it's about integrity and honesty.  You don't
14    go, in my opinion, try to hide something.  She should have
15    been forthright, and come out and said, hey, I missed it,
16    here's what I did, here's what I'm going to do to improve.
17 Q.  And so does that mean that anyone who demonstrates a lack of
18    integrity during operation meetings is subject to
19    termination?
20 A.  Yes.  If we have a technician that lied about something he
21    said he did or did not do on an airplane and it came out,
22    that person is immediately let go from Delta Air Lines.
23 Q.  Now, did Ms. Roberts lie during that meeting?
24 A.  She wasn't forthcoming for sure.
25 Q.  Did she lie during that meeting?

Page 26

1  A.  She was not forthcoming.
2  Q.  It's a yes or no question.
3  A.  Yes.
4  Q.  How did she lie?
5  A.  She lied.
6  Q.  What did she lie about?
7  A.  Because she was not forthcoming.  So we could argue if it's a
8      lie or not a lie, but if she's just answering the question
9      that was asked to her, knowing she messed up in a big kind of
10     way, that, in my opinion, is a big gap in her integrity.  If
11     you want to call it lying or whatever you want to call it,
12     that's your call.
13 Q.  Do you remember what the question was that Ms. Roberts was
14     asked during that meeting?
15 A.  I believe it was something about is the under cowl inspection
16     done.
17 Q.  And did she answer truthfully?
18 A.  She did answer the question about the airplane truthfully.
19 Q.  What did she answer?
20 A.  That the under cowl inspection had been pushed or
21     rescheduled.
22 Q.  Was that the truth?
23 A.  About the under cowl inspection, yes.  About the airplane and
24     being forthcoming, absolutely not.
25 Q.  Was Ms. Roberts asked about the status of the aircraft?

Page 27

1  A.  That's not the question.  She needs to be forthcoming.  She
2      was responsible for the airplane.
3  Q.  Mr. Mitacek, please, if I'm asking you a yes or no question,
4      I would appreciate a yes or no, and then you can give me an
5      explanation.
6  A.  Okay.
7  Q.  Was Ms. Roberts asked about the aircraft?
8  A.  No.
9  Q.  But she was asked about the under cowl inspection?
10 A.  But she was responsible for the aircraft in the response in
11     the operations meeting for that aircraft.
12 Q.  So had that aircraft not been overlooked, would she have
13     still been responsible to report that it was on schedule and
14     --
15 A.  Yeah.  I bet she did respond that to the other two airplanes
16     she was responsible for, she probably gave that information.
17     I don't know that for a fact, but most of the time you talk
18     about every single airplane you're responsible for, it's
19     ready to go or it's not ready to go.
20 Q.  Okay.  Now, let's go back to the few things that you said you
21     considered in your decision to confirm her termination.  So
22     you talked about her past performance issues.  What about her
23     past performance issues made you reach the decision to
24     terminate her?
25 A.  A long string of coaching and discipline, and the fact she

Page 28

1      was already on a FCAN, which is a final notice.  It would
2      appear to me that we've given her plenty of opportunity to
3      improve and she was not a good match for Delta Air Lines.
4  Q.  And do you know that all of those performance issues were
5      related or the bulk of them are related?  Did you see any
6      connection there between the performance issues?
7  A.  There was a couple performance issues that were related, but
8      again, it's just the history of poor performance.
9  Q.  Would you have been aware that she did or didn't improve at
10     any point in or between those corrective action notices?
11 A.  If indeed she had no further write-ups and she wasn't on an
12     FCAN, then I guess I can make that assumption, but I guess
13     that would be an assumption.
14 Q.  But so --
15 A.  The only way I would know is if she didn't receive further
16     disciplinary action, which she did receive.
17 Q.  Okay.  Well, let's talk about when she receives a corrective
18     action notice or some sort of coaching for ordering the wrong
19     parts, let's say, which the record reflects that she did at
20     one point.  And let's say, at a later time, Ms. Roberts
21     receives some type of coaching or corrective action notice
22     about a performance issue unrelated to ordering wrong parts,
23     maybe another safety issue or something like that.
24        Now, if they're unrelated, but you see that both of
25     them are on her record, how could you tell from just

Page 29

1      reviewing her file that she hasn't improved, for instance, on
2      ordering the wrong parts?
3  A.  I think for --
4         MS. GROSS:  I'm going object to the form of the
5      question.  I mean, again, it's a compound question and it's
6      calling for speculation.  You're asking him to imagine
7      things about a record that are not in a record.  She has
8      multiple disciplinary actions for ordering wrong parts.
9      You're asking him to assume facts not in evidence and it's a
10     compound question.  If you understand the question, you can
11     go ahead and answer.
12        MS. DABAJA:  And before you answer, Mr. Mitacek, I
13     can clarify.  I'm not really asking him to speculate here.
14     I'm asking what his decisionmaking process is like and what
15     significance he assigns to certain things in an employee's
16     record.
17        MS. GROSS:  No.  That's not what you asked him.
18     You asked him to imagine that she had one kind of discipline
19     for parts, and then perhaps she had another one for some
20     other safety issue unrelated, and how would he react to
21     things that were unrelated and whether he would know if she
22     improved in the interim.  That's pretty much what you asked.
23        MS. DABAJA:  I'll gladly simplify my question.
24        MS. GROSS:  Okay.
25 BY MS. DABAJA:

Page 30

1 Q. In the instance that you see two unrelated coachings or
2   corrective action notices in an employee file, how could you
3   tell that there was or was not improvement in between those
4   two disciplinary actions or after even?
5 A. You're being really simple. Basically when people are
6   performing poorly, you can't just group it saying, oh, she
7   ordered parts wrong, so that's one issue. Performance is
8   performance. It's about reliability. Does she show up and
9   work on time? Does she do her tasks, all her tasks well?
10  Does she lead her team well? It's not about one thing. It's
11  about her overall work performance. So you cannot take one
12  thing, and ask me, oh, well, how do you know she's improving.
13  Well, I know she's not improving because she's got multiple
14  write-ups. Performance is all those things, not one of those
15  things.
16      MS. DABAJA: Okay. And so I'll introduce here the
17  next exhibit. Debbie, can you remind me what number this
18  is?
19      THE REPORTER: I think it's 5.
20      MS. DABAJA: Okay.
21      THE REPORTER: I can't really -- I mean, it's in
22  the record, but I can't write them down at the same time.
23      MS. DABAJA: No problem. I am, but I missed the
24  last one.
25      MS. GROSS: I have it as 5 as well.

Page 31

1       (An off the record
2       discussion was held).
3       MS. DABAJA: Sorry, my Adobe is acting up.
4       (An off the record
5       discussion was held).
6       DEPOSITION EXHIBIT NUMBER 5 WAS MARKED BY THE
7       REPORTER FOR IDENTIFICATION.
8 BY MS. DABAJA:
9 Q. Can you see this?
10 A. I can.
11 Q. All right. So I'm introducing here Exhibit 5. This is a
12  document from My Career Portal titled Tech Ops:  Lead
13  Evaluation Lead Evaluation for Catherine Roberts. And before
14  we look at this -- well, actually, I'll give you a chance to
15  review it first. Please let me know when you'd like me to
16  scroll.
17 A. You can scroll. You can scroll. You can scroll. You can
18  scroll. You can scroll. You can scroll. You can scroll.
19  You can scroll. Okay.
20 Q. That's the end of it?
21 A. Um-hum.
22 Q. So let's look at the rating key here. So there's a section
23  here on Safety and Compliance, right?
24 A. Yes.
25 Q. And within the Safety and Compliance key, there are specific

Page 32

1   Safety and Compliance statements to which the manager is
2   rating the employee, correct?
3 A. It appears.
4 Q. So we've got Safety and Compliance, we've also got
5   Leadership. Can you confirm that?
6 A. Leadership. Yes.
7 Q. Communication, can you confirm that?
8 A. Yes.
9 Q. Personnel Development?
10 A. Yes.
11 Q. Planning and Organizing?
12 A. Yes.
13 Q. Decision Making?
14 A. Yes.
15 Q. Teamwork?
16 A. Correct.
17 Q. Reliability and Attendance?
18 A. Yes.
19 Q. And Appearance, correct?
20 A. Yes.
21 Q. Okay. And so this rating key is based on a scale of zero to
22  5?
23 A. Um-hum.
24 Q. And for Safety and Compliance here, she's got a couple 3s,
25  but more 4s out of 5, correct?

Page 33

1 A. Correct.
2 Q. And for Leadership she's got a 5, a couple 3s -- sorry -- one
3   3 and a couple 4s, correct?
4 A. Correct.
5 Q. Communication she rates 4 on all of the statements in the
6   Communication key, is that correct?
7 A. Correct.
8 Q. And Personnel Development, she's got mostly 5s and two 4s,
9   correct?
10 A. Correct.
11 Q. In Planning and Organizing, she's got mostly 4s and a couple
12  3s, correct?
13 A. Correct.
14 Q. In Decision Making, she's got mostly 4s, a 5, and a single 3,
15  correct?
16 A. Correct.
17 Q. In Teamwork, she's got all 4s out of 5, correct?
18 A. Correct.
19 Q. And then I'll scroll all the way to the top now.
20 A. Okay.
21 Q. Do you see when the due date of this evaluation was?
22 A. Yes.
23 Q. What date was that?
24 A. 6-16-2019.
25 Q. Right. And the review period here was for --

Page 34

1  A.  4-17-2019 to 6-16-2019.
2  Q.  Right. And when we scroll all the way to the bottom here,
3      where we see Mr. David Pidruzny, who is the manager, where we
4      see Mr. David Pidruzny's comments at the bottom, it reads,
5      "Cathy, you have improved over the last year. Please stay
6      focused and continue improving yourself. Remember to lead
7      your team and not let them lead you. Focus on your
8      responsibilities, keep climbing." Can you confirm that?
9  A.  I can.
10 Q.  Okay. I'll stop sharing there for a moment. We're going to
11     take a look at an exhibit that I presented earlier, the memo
12     from Mr. John Mazza. And what you see here on the second
13     page is LAMT Catherine Roberts has been repeatedly advised of
14     the need to improve her performance on the following
15     occasions. And Mr. Mazza lists January 19th, 2019; August
16     14th, 2018; and October 18, 2017, correct?
17 A.  Correct.
18 Q.  And would all of those dates have preceded Ms. Cathy Roberts'
19     evaluation on June 16th, 2019?
20 A.  Yes.
21 Q.  And so the following paragraph, since receiving a final
22     corrective action in January of 2019, which was prior to Ms.
23     Roberts' evaluation in June 2019, Ms. Roberts has been issued
24     formal verbal coachings about her conduct and performance on
25     the following dates. We've got September and August of 2019,

Page 35

1      which were subsequent to that evaluation, correct?
2  A.  Correct.
3  Q.  Now, at the point that Mr. Mazza is sharing this memo with
4      Mr. Bowker, in December of 2020, this is prior to you
5      reviewing Ms. Roberts' file and making your recommendation
6      later on in April, correct?
7  A.  Can you say that again, please.
8  Q.  Sure. So Mr. Mazza's memo here, dated December 18, 2020, was
9      sent prior to you reviewing her file, correct?
10 A.  Yes.
11 Q.  Right. And so Mr. Mazza lists these items here -- I'm not
12     sure if you can see me highlight them?
13 A.  Yes.
14 Q.  Were these all prior to her evaluation in 2019, in June of
15     2019?
16 A.  Correct.
17 Q.  I'll bring that back up again. Was this evaluation something
18     that you reviewed as part of her file when you made the
19     decision to terminate her?
20 A.  I do not recall seeing that.
21 Q.  Okay. And so at the point where you refer to her performance
22     issues, the only corrective action notices that were actually
23     documented preceded this evaluation that reads that she has
24     been improving and should continue to improve, but even
25     beyond that, she's scoring close to 5 in the majority of her

Page 36

1      rating, would that not be an indication that she has improved
2      over time?
3  A.  I cannot speculate because I didn't see this and I didn't
4      write it.
5  Q.  Well, what I'm asking you to do is confirm that this
6      evaluation from Mr. David Pidruzny is Mr. David Pidruzny,
7      essentially, stating that she has improved since January
8      2019?
9  A.  You're asking me a question I can't answer, because I'm not
10     responsible for this detail.
11 Q.  Mr. Mitacek, I'll make it even more simple. In this
12     highlighted sentence here, on -- let's go back.
13         The date at the top of this evaluation reads June
14     16, 2019, correct?
15 A.  Correct.
16 Q.  And the final corrective action notice that Ms. Roberts was
17     issued that you said had significance to you in your decision
18     to terminate her was in January 2019, correct?
19 A.  Correct.
20 Q.  Okay. Mr. David Pidruzny's statement at the end of this
21     evaluation reads, "Cathy, you have improved over last year."
22     And what I'm asking for you to confirm is that Mr. Pidruzny
23     stated that subsequent to her final corrective action notice
24     in January of 2019?
25         MS. GROSS: Object to the form of the question.

Page 37

1      The document speaks for itself and the witness has already
2      confirmed the words say what they say. He can't say any
3      more than that. Go ahead and answer the question, if you
4      understand it.
5         THE WITNESS: You're confirming exactly what the
6      document said. Yes.
7  BY MS. DABAJA:
8  Q.  Okay. And so you mentioned earlier, Mr. Mitacek, that when
9      you reviewed her performance issues and you saw no
10     improvement and you saw that there were subsequent
11     performance issues after that, which Mr. Mazza lists as
12     written and verbal coachings only, how would you have known
13     that she didn't improve or how did you come to the decision
14     that she had not improved over time?
15 A.  Based on the number of write-ups in her file. I would put
16     it's highly unusual that an employee would have that many
17     write-ups in their file. So I understand what you're telling
18     me, however, there's a lot of performance issues in her file,
19     and that, in my expert opinion is over and above a normal,
20     good employee.
21 Q.  Is there a reason why Ms. Roberts may have had more
22     performance issues than anyone else that she was working with
23     or that you had seen before?
24 A.  I can't answer that.
25 Q.  Okay. Do you think that it's important for you to see or

Page 38

1 review evaluations in your review of an employee file when
2 deciding to terminate them?
3 **A. I was not aware of the employee evaluation. I did not see**
4 **that form. I don't recall seeing that form.**
5 Q. My question to you, Mr. Mitacek, is do you think that it's
6 important to review an employee's evaluations in your
7 decision to terminate?
8 **A. Yes.**
9 Q. Is there a reason that you did not ask for evaluations in the
10 same way that you asked other people other questions about
11 Ms. Roberts' file?
12 **A. I believe when --**
13 MS. GROSS: Object to the whole question. There's
14 been no testimony that he asked other people questions about
15 Ms. Roberts' file. He said he had one conversation, he
16 doesn't remember the details of it.
17 MS. DABAJA: He confirmed in later testimony that
18 he did ask them questions about Ms. Roberts' file.
19 MS. GROSS: No. He did not.
20 **THE WITNESS: No.**
21 MS. GROSS: He's never testified to that. He
22 testified he had one conversation with one witness that he
23 doesn't remember the details of.
24 MS. DABAJA: I remember I said, Mr. Mitacek, can
25 you confirm that those are the types of questions that you

Page 39

1 would have asked someone like Mr. Allen.
2 MS. GROSS: That's a speculative -- this is
3 exactly why I objected to your question as being
4 speculative. You're asking him to speculate from his
5 general processes -- answer to general processes questions
6 of whether that's what he asked Mr. Allen. He unequivocally
7 testified that he does not remember what he talked to Mr.
8 Allen about.
9 MS. DABAJA: Understood. Then I can just ask that
10 first part of the question.
11 MS. GROSS: I'm going to object to the
12 mischaracterization of his testimony in the previous
13 question. If you want to rephrase the question, that's
14 great.
15 BY MS. DABAJA:
16 Q. Do you think it's important -- or I'm sorry, we already
17 answered that question.
18    Is there a reason that you did not look into her
19 evaluations any further or at all?
20 **A. I have what I think is all the pertinent information within**
21 **the file, and the evaluation process, frankly, I don't know**
22 **if that was a new thing or I don't know how long that's been**
23 **going on. Regardless of that, the information I get in her**
24 **file, is the information I go with. If there's gaps that I**
25 **don't understand, I may ask somebody. I did not -- I had her**

Page 40

1 file, and I based my decision on the facts I had within her
2 file.
3 Q. I understand. And so what you just said is that you have all
4 the pertinent facts that you needed in that file?
5 **A. I thought I had all the information that was available to me.**
6 **I don't recall seeing that evaluation.**
7 Q. But your opinion is that such evaluations are important in
8 making that type of decision, correct? That is what you
9 testified.
10 **A. You keep asking me a question that I didn't have the**
11 **information to. So --**
12 Q. I'm not asking --
13 **A. There's so much information that's available to me to make a**
14 **decision. I didn't have that information. If I had that**
15 **information, maybe I would have talked to HR, maybe I would**
16 **have talked to somebody else to say, you know what, tell me**
17 **more about this.**
18 Q. Okay.
19 **A. But I didn't have it, and you keep asking me the question**
20 **what would I --**
21 Q. Understood. Understood. And so we went over Ms. Roberts'
22 performance issues?
23 **A. Yeah.**
24 Q. The other factor that you took into consideration was this
25 last December 2020 incident?

Page 41

1 **A. Yeah.**
2 Q. And that was the integrity issue, correct?
3 **A. Yes.**
4 Q. Was it anything beyond the integrity issue?
5 **A. Continued poor performance. I mean, we could look at the**
6 **evaluation, and I see what you're saying, but we could look**
7 **at the very specifics of how she doesn't perform, and that's**
8 **what I would base my decision on, those very specific issues**
9 **and concerns, and the fact she was on a final corrective**
10 **account notice. Another infraction she would have been let**
11 **go, and she knew that.**
12 MS. DABAJA: I have no further questions.
13 MS. GROSS: I have a couple of quick followups.
14                EXAMINATION
15 BY MS. GROSS:
16 Q. Just so that we're clear, Mr. Mitacek, when that appeal comes
17 to you through the CRP from an employee who has been
18 terminated, they've already been terminated, and they're
19 asking you to reinstate them?
20 **A. I'm struggling to where that because sometimes --**
21 Q. Okay. Let me see --
22 **A. It's not specific always to termination. For an example --**
23 Q. I just want to ask about termination so let me show you --
24 **A. I'm sorry.**
25 Q. Okay. Can you see my screen?

Page 42
1  A.  I can.
2  Q.  So this is the letter that was referred to earlier.  I don't
3      know if it was -- I don't know if you looked at it or not.
4      This was the April 16th letter of 2021 from you to Ms.
5      Roberts?
6  A.  Okay.  We did not look at it earlier.
7          MS. GROSS:  Okay.  Let's make this Exhibit Number
8      6 then, if we could.
9          DEPOSITION EXHIBIT NUMBER 6 WAS MARKED BY THE
10         REPORTER FOR IDENTIFICATION.
11 BY MS. GROSS:
12 Q.  Okay.  So you -- well, first of all, looking at this, do you
13     recognize the letter at all?
14 A.  I do.
15 Q.  Do you actually write this letter?
16 A.  Typically, what I do is I tell my assistant, you know, here's
17     the outline of the letter, she types it up, and then we take
18     it to HR.  I, typically, will take it to HR, and make sure
19     that everybody's comfortable with the letter, and then we
20     send it.
21 Q.  So the subject line is step 4 of the conflict resolution
22     process.  Does that refresh your recollection at all as to
23     whether or not you are at step 4, in fact?
24 A.  Yes.  Thank you.
25 Q.  You tell Ms. Roberts I understand your reference for review

Page 43
1      in accordance with step 4 of the conflict resolution process.
2      Then you proceed to tell her the termination of all fellow
3      TechOps team member is never easy and it's not done so
4      lightly.  Having reviewed the available information, I uphold
5      the company's decision made to end your employment with Delta
6      Air Lines.  Then you go on to explain that prior to her
7      termination she was on an FCAN, etc.  So does this refresh
8      your recollection that, at least, in the case of a terminated
9      employee coming to you for review, you're reviewing whether
10     or not to uphold or undo the termination decision basically?
11 A.  Correct.
12 Q.  Okay.  And if we could also look at what was previously
13     marked as an exhibit, which is the Delta front line
14     performance development employee guidelines, and
15     specifically, I'd like to direct your attention to the chart
16     in the middle of page two of this document.  Can you see
17     that?
18 A.  I can.
19 Q.  Okay.  What's the duration of a final corrective action
20     notice?
21 A.  36 months.
22 Q.  So if we go back and look at the documentation that was also
23     previously marked, which is the December 18th recommendation
24     for termination from Mr. Mazza to Mr. Bowker, this indicates
25     that Ms. Roberts had been given an FCAN as of January 2019,

Page 44
1      correct?
2  A.  Yes.
3  Q.  Okay.  So when she got that performance -- that six month
4      performance evaluation that you were previously shown in June
5      of 2019, she was still on FCAN, correct?
6  A.  Correct.
7  Q.  And even after being on an FCAN and after the June 2019
8      performance evaluation, she got three more final corrective
9      action notices, two for performance, one for conduct?
10 A.  Correct.
11 Q.  Okay.  So with or without having seen the performance
12     evaluation, you had available to you information that she was
13     on an active FCAN, which she only got after having gotten a
14     CAN before that, and that she had three more disciplines at a
15     final corrective action level after the FCAN, correct?
16 A.  Correct.
17 Q.  You made the statement that in addition to -- in concert with
18     the integrity issue at some length, and you made the
19     statement that it was also continued poor performance.  Do
20     you consider missing an airplane entirely to be indicative of
21     poor performance?
22 A.  Oh, absolutely.  I mean that's one of our primary reasons at
23     TechOps, making sure the airplanes are maintained and safe.
24 Q.  And you mentioned that you think some of the Delta documents
25     like the way we fly and rules of the road actually have

Page 45
1      guidance with respect to honest, truthful communications?
2  A.  Correct.  I would like to further state on that, that's just
3      not a Delta thing.  That's an industry thing.  I assume Ms.
4      Roberts has an A and P licence and you take an oath to
5      honestly and trustworthiness when you get your A and P
6      license.  That's how importance it is.
7  Q.  And for the record, what does that stand for?
8  A.  Airframe and powerplant, FAA license.
9  Q.  And you were asked a number of questions about whether or not
10     you thought that Ms. Roberts had answered truthfully if she
11     was only asked about the under cowl inspection.  If she was
12     asked about the under cowl inspection and she answered that
13     the under cowl inspection had been deferred, but failed to
14     disclose that she had missed the entire plane, and that the
15     entire plane was going to have to be deferred, is that
16     something that you consider to be an honest and forthright
17     answer?
18 A.  Absolutely not honest and forthright.
19 Q.  Did you have any conversations with John Mazza about
20     Catherine Roberts?
21 A.  I did not.
22 Q.  Did you have any conversations with Dave Pidruzny about
23     Catherine Roberts?
24 A.  I did not.
25 Q.  I'm going to show you one more document.  Mr. Mitacek, can

Page 46

1  you see the memorandum that's labeled April 13th, 2021?
2  A.  I can.
3  Q.  Okay.  This appears to be coming to you from Enrique Perez,
4      who's identified as the CRP gatekeeper?
5  A.  Yes.
6  Q.  If you could take a look and take a minute and read this.
7  A.  Okay.  You could scroll.  Yeah.  Yeah.
8  Q.  So looking at this, does this refresh your recollection about
9      when the transmittal of a file would have come to you at the
10     request to be the step 4 review?
11 A.  Yeah.  April 13th, 2021.
12 Q.  Okay.  And you were called in appearance by the CRP
13     gatekeeper that the results of the review panel was, one, to
14     uphold termination, and four, to modify.  So they weren't
15     granting the request to bring Ms. Roberts back as a lead, but
16     they were suggested it could be modified, and she could be
17     demoted to a technician.
18         What, if any, reasons did you have for not wanting
19     to just bring her back as a technician as opposed to a lead?
20 A.  A record of very poor performance and the integrity.  And
21     integrity is super critical regardless if you're AMT or a
22     lead or a manager.
23         MS. GROSS:  I have no further questions.
24         MS. DABAJA:  No further questions.
25         THE REPORTER:  Okay.  Can I have your orders?

Page 47

1         MS. DABAJA:  PDF transcript, please.
2         MS. GROSS:  I'll take the same.  Can I have mini,
3  please.
4         (The deposition was concluded at 5:50 p.m.)

Page 48

1  STATE OF MICHIGAN      )
2  COUNTY OF LIVINGSTON   )
3
4
5
6         I Debra M. Cummings, CSR 6037, and Notary Public,
7  certify that this transcript, consisting of 48 pages, is a
8  complete, true, and correct record of the testimony of
9  DONALD MITACEK, held in this case on October 10, 2023.
10        I also certify that prior to taking this
11 deposition, DONALD MITACEK was duly sworn to tell the truth.
12        I also certify that I am not a relative or
13 employee of or an attorney for the party; or a relative or
14 employee of an attorney for a party; or financially
15 interested in the action.
16
17
18
19
20 *Debra Cummings*
21 _____
22 Debra M. Cummings CSR 6037
23 Notary Public: Livingston County, Michigan
24 My Commission expires:  7-18-2023
25 DATED:  October 13, 2023