UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE ROBERTS,

        Plaintiff,

v.

DELTA AIR LINES, INC.,

        Defendant.
_____/

Civil Case No. 22-cv-12678

HON. MARK A. GOLDSMITH

**OPINION & ORDER
(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 22)
AND (2) DENYING THE MOTION TO EXTEND (Dkt. 23) AND THE MOTION IN
LIMINE (Dkt. 24)**

Plaintiff Catherine Roberts filed this lawsuit alleging discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., after her employment was terminated by Delta Air Lines, Inc.

Delta filed a motion for summary judgment (Dkt. 22).[1]  For the below reasons, the Court grants Delta's motion.

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the motions, the briefing includes Roberts's response (Dkt. 27) and Delta's reply (Dkt. 28).

Delta filed a motion in limine arguing that certain evidence should be excluded from consideration (Dkt. 24).  The Court finds that consideration of the excluded evidence does not affect its analysis, so it denies the motion as moot.

Roberts also filed a motion to extend the deadline for submission of jury instructions (Dkt. 23).  Because the Court subsequently adjourned all remaining scheduling order dates, see 11/9/23 Order, that motion is denied as moot.

I.     BACKGROUND

The following facts are undisputed.

Plaintiff Roberts was hired as a maintenance technician by Northwest Airlines in 1999. Def. Statement of Mat. Facts (SOMF) ¶ 1 (Dkt. 22). When Northwest merged with Defendant Delta Air Lines, Inc., Roberts became a Delta employee. Id. She was promoted to the position of lead aviation maintenance technician in September 2016. Id. During the time period at issue, Roberts worked at Detroit International Airport (DTW), on the night shift. Id.; Roberts Dep. at 16, 23-25 (Dkt. 22-2). Her station manager was John Mazza and her shift manager was Dave Pidruzny. Def. SOMF ¶ 4; Roberts Dep. at 29, 32.

On December 10, 2020, Aircraft (AC) No. 6710 arrived at DTW in the evening and was scheduled to depart for Mexico the next morning. Def. SOMF ¶ 10. The TechOps planning team in Atlanta, where the aircraft had been located before arriving at DTW, had determined that the aircraft needed maintenance. Id. According to Federal Aviation Administration (FAA) regulations, the aircraft would be grounded wherever it was located if that maintenance work was not accomplished after another 10.2 hours of flying. Def. SOMF ¶ 11.

Roberts was responsible for assigning the required maintenance work for AC 6710 to technicians on her crew for completion that night. Def. SOMF ¶ 12; Roberts Dep. at 42–44. Due to an error on Roberts's part, the maintenance on AC 6710 was not performed. Def. SOMF ¶¶ 13–14. She realized the error approximately twenty minutes prior to joining the daily 6:45 a.m. shift turnover meeting on December 11, 2020. Id. ¶ 14; Roberts Dep. at 46–47, 77–78. The purpose of the morning meeting is for duty managers and leads to review the status of overnight maintenance work with the station manager, confirm flight readiness for departing aircraft, and determine if

there were maintenance items that did not get done and how they were being addressed. Def. SOMF ¶ 15 (citing Roberts Dep. at 23–25, 29–30; Mazza Decl. ¶ 6 (Dkt. 22-3)).

During the meeting, Mazza asked Roberts about the status of the under-cowl inspection on AC 6710—one of the maintenance items for the aircraft that Roberts and her team were supposed to perform. Def. SOMF ¶ 17. Roberts told Mazza that she had deferred that inspection but did not disclose that she had missed the maintenance for the entire aircraft or that she had asked the planning team to defer all of the maintenance work. Id. (citing Roberts Dep. at 77–78, 83–84, 188–189; Mazza Decl. ¶ 6). Because the entire work package had to be deferred, AC 6710 had to be re-routed from Tampa to Fort Lauderdale, and additional AMTs had to be brought into Fort Lauderdale to perform the work. Def. SOMF ¶ 19 (citing Mazza Decl. ¶ 8).

After discovering what had happened, Mazza recommended terminating Roberts's employment, citing both her error in missing AC 6710 as well as her decision not to disclose the error during the morning turnover meeting. Def. SOMF ¶ 26 (citing Mazza Decl. ¶ 13). He also noted various other performance and behavioral errors she had made as contributing to his decision. Specifically, Roberts already had: (i) an active corrective action notice (CAN)[2] for ordering an incorrect nose wheel, which resulted in a plane flying out of compliance with FAA regulations, a violation that Delta had to disclose to the FAA; (ii) an active final corrective action notice (FCAN) for ordering an incorrect part number that delayed repairs; and (iii) three formal verbal coachings for behavioral and performance issues while on the FCAN. Def. SOMF ¶ 28 (citing Mazza Decl. ¶ 14; 1/19/19 FCAN (Dkt. 22-14); 8/14/18 CAN (Dkt. 22-15); 10/3/19 Formal

---

[2] Delta's Performance Development Guidelines present various tools Delta can use to address performance and conduct issues, including—in order of escalating severity—(i) informal verbal coaching, (ii) formal verbal coaching; (iii) written coaching; (iv) a corrective action notice; and (v) a final corrective action notice, which is the highest level of discipline short of termination. Def. SOMF ¶ 6; Performance Development Guidelines (Dkt. 22-4).

3

Verbal Coaching (Dkt. 22-16); 8/4/19 Formal Verbal Coaching (Dkt. 22-17); 10/18/17 Written Coaching (Dkt. 22-18)).

Human Resources agreed with the recommendation and offered Roberts the option to resign or retire in lieu of termination. Roberts elected termination, which was effective on December 28, 2020. Def. SOMF ¶¶ 29, 31. She appealed her termination and requested reinstatement to her lead position through Delta's internal conflict resolution process. Def. SOMF ¶ 39 (citing Roberts Dep. at 150–151). The conflict resolution review panel did not approve Roberts's request to return to a lead position; however, four panel members voted to reinstate her but demote her to a technician. Id. ¶ 41. The appeal was then submitted to the senior vice president of technical operations, Don Mitacek. Id. ¶ 42. Mitacek upheld the termination. Id. ¶ 44. He explained his reasons for his decision during his deposition: "One is her repeated track record of poor performance, and two, is on that specific issue with the airplane, I felt there was a significant integrity issue, and that [the] aviation industry is based on integrity and trustworthiness, and I felt like that was missing in her decision." Mitacek Dep. at 22 (Dkt. 22-20).

## II.   ANALYSIS[3]

Because there is some disagreement between the parties regarding whether the Court should analyze Roberts's discrimination claim as a single-motive claim or a mixed-motive claim, the Court begins by addressing that issue. As explained below, because it finds that Roberts has

---

[3] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1985).

provided sufficient notice of her mixed-motive claim, the Court will analyze her claim under the mixed-motive analysis

### A. Single-Motive Claim vs. Mixed-Motive Claim

Employment discrimination claims brought under Title VII "are traditionally categorized as either single-motive claims, i.e., where an illegitimate reason motivated an employment decision, or mixed-motive claims, i.e., where both legitimate and illegitimate reasons motivated the employer's decision." White v. Baxter Healthcare Corp., 533 F.3d 381, 396 (6th Cir. 2008).

The parties disagree as to whether Roberts's claim should be evaluated as a single-motive or mixed-motive claim. In her complaint, Roberts does not specify which theory she is proceeding under, though the allegations she lays out follow the test for a single-motive discrimination claim brought based on circumstantial evidence. See Compl. ¶¶ 33–44. Delta's motion for summary judgment addresses Roberts's claim as a single-motive claim. Mot. at 15–25. However, in her response, Roberts argues that her claim should be evaluated under a mixed-motive theory as well. Resp. at 12–13. She argues that a plaintiff is permitted to give notice of a mixed-motive claim at the summary judgment stage. Id. at 13.

"A plaintiff triggers mixed-motive analysis by giving notice of bringing such claims." Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 649 (6th Cir. 2012). A plaintiff may give notice "expressly by invoking the mixed-motive analysis or impliedly through use of the motivating factor test in the complaint and responsive pleadings." Id. Delta argues that Roberts has given insufficient notice of her mixed-motive claim because her complaint is devoid of mixed-motive allegations and because Roberts has "consistently asserted that Delta's adverse actions were 'because of her sex' not mixed legitimate/illegitimate motives." Reply at 1.

5

In Ondricko, the Sixth Circuit found that the plaintiff had given adequate notice of her mixed-motive claim where the plaintiff only included the theory in her response to a motion for summary judgment. Ondricko, 689 F.3d at 649. The court made no mention of the complaint. Id. Therefore, following Ondricko, the Court finds that Roberts has given sufficient notice of her mixed-motive claim by including it in her response to Delta's motion for summary judgment.

"The Sixth Circuit has indicated that the mixed-motive route to a jury is less demanding than the single-motive route." Patel v. Trinity Health Corp., No. 20-10517, 2021 WL 4894637, at *9 (E.D. Mich. Oct. 20, 2021) (citing White, 533 F.3d at 400–401; Wallner v. Hilliard, 590 F. App'x 546, 552 (6th Cir. 2014)). Because, as explained below, Roberts cannot prevail under a mixed-motive theory, she would not prevail under a single-motive theory either. Therefore, it is not necessary to analyze Roberts's claim under both the single-motive and mixed-motive frameworks, and the Court will proceed under the mixed-motive framework only.

### B. Mixed-Motive Analysis

To survive a motion for summary judgment, a plaintiff asserting a Title VII mixed-motive claim must produce sufficient evidence to demonstrate that (i) the defendant took an adverse employment action against the plaintiff; and (ii) race, color, religion, sex, or national origin was a motivating factor for that adverse employment action. White, 533 F.3d at 400. The motivating-factor standard "require[s] some evidence of discriminatory bias that has some connection to the adverse employment action." Lopez v. Am. Farm. Ins. Co., 618 F. App'x 794, 800 (6th Cir. 2015) (emphasis omitted). These requirements apply to mixed-motive claims regardless of whether the plaintiff relies on direct or circumstantial evidence of discrimination. White, 533 F.3d at 400.

The presence of an adverse action here is not disputed. The question for the Court is whether Roberts has established that sex was a motivating factor for that adverse employment

6

action. The Court finds that she has not.

Roberts offers both direct and circumstantial evidence that she says demonstrates that her sex was a motivating factor in Delta's decision to terminate her position. One way she attempts to prove this is by offering direct evidence in the form of prior remarks made by Mazza and Pidruzny that she says evidence gender bias.

Any comments made by Pidruzny are not relevant. "[C]omments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination." See Carter v. Univ. of Toledo, 349 F.3d 269, 273 (6th Cir. 2003). Delta states that Pidruzny was not involved in the decision to terminate Roberts's employment. Def. SOMF ¶ 30. In his deposition, Pidruzny testified that he was not "involved in any capacity in the discipline that took place following" the AC 6710 maintenance issue. Pidruzny Dep. at 25 (Dkt. 22-21). He also did not conduct the investigation into the incident. Id. at 46.

Discriminatory remarks and actions on the part of Mazza, on the other hand, are relevant, as he is the one who recommended Roberts's termination. Roberts testifies that, on one occasion, when Roberts was complaining of being lightheaded after returning from a quarantine, Mazza dismissed the lingering symptoms of her illness as being "due to menopause." Resp. at 19; Roberts Dep. at 194–195. But Roberts does not connect this statement, inappropriate as it was, to her termination, and "[i]solated and ambiguous comments" will not support a finding of discrimination. See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 355 (6th Cir. 1998).

Roberts also attempts to make her case by providing examples of male employees who she says were similarly situated and subject to less harsh discipline for similar conduct.

7

For example, she discusses a formal verbal coaching she received in October 2019 —one of the three formal verbal coachings noted by Mazza as contributing to his recommendation to terminate her employment—for asking one of her peers, who had just received an award for community service, "what he did out it in the community." Resp. at 16–17; Roberts Dep. at 121, 127–131. This was interpreted as a comment made in bad faith. See Roberts Dep. at 123. She compares this to a formal verbal coaching a male colleague, Jason Kutchins[4], received after he "angrily hung up on one of his supervisors," Johnson Dep. at 60–61 (Dkt. 27-3): "The discipline that [Roberts] received for a mere insinuation, Mr. Kutchins had received for direct and volatile insubordination." Resp. at 17. This is not evidence of gender discrimination. To begin with, Roberts has not explained why it is not possible that both events could both appropriately receive that level of disciplinary action. Additionally, the details Roberts provides regarding both incidents are minimal and offer nothing to suggest that gender played any role in the selected disciplinary actions.

Roberts also attempts a comparison regarding the FCAN for ordering an incorrect part—another disciplinary action cited by Mazza as contributing to his decision to terminate her employment. Resp. at 6. Roberts states that she named three male employees as partly responsible for the incorrect part being ordered. Id. She argues that Pidruzny's decision not to amend the FCAN after speaking to those three employees, "despite Plaintiff's explanation to him that their statements that they [had] notified her of the incorrect part number [were] inaccurate," was due to his discriminatory animus toward her. Id. As explained above, because Pidruzny was not involved with the decision to terminate her, evidence regarding his potential bias is not evidence that there

---

[4] Roberts spells his name both as "Cutchins" and "Kutchins" in her response brief. Resp. at 16–17.

was a discriminatory motive behind her termination. Further, the fact that Pidruzny chose not to amend the FCAN does not mean she should not have received it.

Regarding the error and failure to disclose associated with the AC 6710 incident—the primary reason behind Mazza's decision to terminate Roberts—Roberts argues that "other male employees had engaged in the same conduct but were not terminated." Resp. at 2. She testified that she spoke to Robert Searfoss and Dough Sytsma, two other, male, lead technicians, about the AC 6710 issue, and they told her that they had missed an aircraft before and said "Don't worry. You won't get terminated from it." Roberts Dep. at 53. Roberts acknowledges that she does not know anything about the circumstances of any aircraft missed by Sytsma or Searfoss or any potential disciplinary actions taken against them. Resp. at 8. Delta has no record of discipline for either of those employees during the time relevant to this litigation. Def. SOMF ¶ 44. Roberts has offered no evidence from which the Court can conclude that there was a disparity in treatment here, let along that any disparity was due to gender discrimination.

The Court finds that this collection of attempted comparisons does not offer evidence that Roberts's sex was a motivating factor in Delta's decision to terminate her. As explained above, each comparison is unpersuasive as evidence of discrimination on its own. And to the extent that Roberts intended the examples to support her claim that disciplinary actions were taken against her "in an arbitrary and discriminatory manner," see Resp. at 4, they are similarly unpersuasive. Roberts has provided no evidence of male employees who had a similar collection of disciplinary actions on their records but who were not terminated. She also provides no information regarding the job title and responsibilities, experience, and prior disciplinary history of the male employees she attempts to use as comparators. Roberts does not offer evidence as to whether Mazza—or

9

anyone else involved in the decision to terminate her employment—played a part in deciding what disciplinary actions to take against Roberts or her alleged comparators in the above scenarios.

Roberts also makes more general allegations about Delta's DTW location being a discriminatory environment. For example, after failing to disclose the status of AC 6710 during the morning meeting—a primary reason for Mazza's termination recommendation—she sent a supplemental explanation stating that she chose not to disclose the status of the aircraft because:

> In honesty, I did not want to disclose my overlook in front of all the leads and my station manager to be ridiculed and criticized, I can't handle that, I portray such a tough individual, I'm tough but weakened, being the only female is very tough to say the least, I always feel like I'm on an island by myself, with no one in my corner or it's the good ole boy club and I'm not one of the boys. I felt awful about missing an a/c and needed to fix my mess up.

Roberts Dep. at 81–82; Roberts Statement at PageID.265 (Dkt. 22-8). Delta points out that Roberts made no prior complaints of being ridiculed in turnover meetings. Def. SOMF ¶ 24. Roberts argues that was because Mazza and Pidruzny were two members of the "boys club" to which she was referring. Resp. at 3. She also testified that she was the only female lead technician. Roberts Dep. at 31. Roberts's testimony that her work environment felt like a "boys club"—a term she does not fully define or explain—does not amount to evidence that there was any gender bias, much less that that Delta's decision to terminate her was motivated by gender bias.

In arguing that the above evidence is sufficient for her mixed-motive claim to survive summary judgment, Roberts relies on Ondricko, 689 F.3d 642, and White, 533 F.3d 381. Both of these cases are distinguishable.

In Ondricko, the court found that the plaintiff had provided sufficient evidence that race was a motivating factor where a supervisor with influence over the plaintiff's termination had stated: "Do you think I wanted to fire [plaintiff], I didn't want to fire [plaintiff], how can I keep the white girl." 689 F.3d at 648. In White, the Sixth Circuit found that the plaintiff had offered

10

sufficient circumstantial evidence for a jury to conclude that plaintiff's supervisor's decision to give the plaintiff a downgraded performance evaluation was motivated by racial animus. White, 533 F.3d at 402. In so finding, the court asked two questions: (i) whether the plaintiff had provided sufficient evidence to suggest that the supervisor harbored a discriminatory animus toward Black people, and (ii) whether the plaintiff had provided sufficient evidence from which a jury could logically infer that the racial animus was a motivating factor in his decision to downgrade the plaintiff's performance review. Id., 533 F.3d at 404. The court held that the answer to the first question was yes, as the record reflected that the supervisor had made several comments that a jury could reasonably find to be indicative of racial bias, such as "nobody wants to be around a black man." Id. Regarding the second question—which the court found to be a closer call—the plaintiff had provided evidence that the supervisor applied one standard to the plaintiff's performance evaluation, and another (less harsh) standard to the other employees. The court held that this was sufficient to establish a question of fact.

The evidence Roberts provided here is not comparable to the evidence considered by the court in Ondricko, where the supervisor expressly took race into account in making his evaluation of the plaintiff. Here, there is nothing close to that, as the testimony simply does not show discriminatory intent. Mazza's statement about menopause was inappropriate but it was an isolated incident with no apparent connection to her termination, and isolated incidents do not amount to evidence of discrimination. See Ercegovich, 154 F.3d at 355. Roberts's complaint about the "boys club" environment is vague, non-specific, and lacking in any indication of animus. That she was the lone female technician also says nothing about animus. Roberts has provided nothing to allow a jury to conclude both that Mazza harbored discriminatory animus and that the animus motivated his decision to recommend that Delta terminate her employment.

11

In <u>White</u>, the discriminatory comment—that "nobody wants to be around a black man"—is an unambiguous statement of animosity towards Black people. Additionally, in <u>White</u>, the plaintiff had offered evidence that his supervisor applied the wrong standard to evaluate his performance while he applied the correct standard to all other employees. The comment in <u>Ondricko</u>, where the supervisor said "how can I keep the white girl," is even more direct. This kind of evidence is missing from Roberts's case.

The Court finds that Roberts has not offered sufficient evidence to satisfy even her "minimal burden of production on the issue" of whether her sex was a motivating factor in Delta's decision to terminate her.

### III. CONCLUSION

For the above reasons, the Court grants (i) Delta's motion for summary judgment (Dkt. 22) and (ii) denies the motion to extend filed by Roberts (Dkt. 23) and the motion in limine filed by Delta (Dkt. 24).

SO ORDERED.

Dated: September 27, 2024                          s/Mark A. Goldsmith
       Detroit, Michigan                           MARK A. GOLDSMITH
                                                   United States District Judge